Claim No. 1 recites a method for heat-setting heat-settable [9] textile materials by continuously passing the fabric through a heating zone and continuously directing thereon a heating gas current of a velocity of at least 400 feet per minute at a predetermined heat-setting temperature, exposing the material thereto for from 1 to 10 seconds.

Claim No. 2 recites a method for heat-setting heat-settable textile materials by continuously passing the fabric through a heating zone and continuously directing thereon a heating gas current of a velocity of at least 400 feet per minute at a predetermined heat-setting temperature of from 300 to 500° F. and exposing the material thereto for from 1 to 10 seconds.

Claim No. 3 recites a method for heat-setting heat-settable textile materials by continuously passing the fabric through a heating zone and continuously directing thereon a heating gas current of a velocity of at least 400 feet per minute at a predetermined heat-setting temperature of from 300 to 500° F., exposing the material thereto for from 1 to 10 seconds and subjecting it to cooling upon leaving the heating zone.

Claim No. 4 recites a method for heat-setting a web of heat-settable textile material in extended state by continuously passing the web through a heating zone and continuously directing thereon, uniformly over the width and length thereof, a heating gas current of a velocity in excess of about 400 feet per minute at a predetermined heat-setting temperature of about 300 to 500° F., exposing the material thereto for from 1 to not more than 10 seconds and subjecting it to cooling upon leaving the heating zone.

Claim No. 5 recites a method for heat-setting a web of heat-settable poly-amide [10] fabric in extended state by con-tinuously passing the web through a heating zone and continuously directing thereon, uniformly over the width and length thereof, a heating gas current of a velocity in excess of about 400 feet per minute at a predetermined temperature of about 400 to 475° F., exposing the material thereto for from 1 to not more than 10 seconds and subjecting it to cooling upon leaving the heating zone.

**ANTHONY M. MEYERSTEIN, Inc.**
v.
**The UNITED STATES.**
No. 49498.

United States Court of Claims.
July 12, 1956.

---

9. The patent (Col. 4, Line 17) provides that "[t]he term "heat-settable" fabric or similar expression used herein is intended to designate any textile material containing or consisting of fibers capable of being set (i. e. fixed) by the application of heat, into desired condition of modified characteristics."

10. The patent (Col. 4, Line 23) provides that " * * * polyamide fabrics or fibers * * * is intended to connote any fabric or fiber consisting of or containing polyamide fibers and specifically polyamide fibers of synthetic linear poly-amides."

Albert Foreman, New York City, for plaintiff. M. Carl Levine, and Morgulas & Foreman, New York City, were on the briefs.

John F. Wolf, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues to recover $51,446.06 which it claims is due it under a contract with defendant's War Department, under the terms of which plaintiff agreed to repair or recondition certain Government jeeps. The contract was terminated by the defendant prior to its completion, for the convenience of the Government. All of plaintiff's claims incident to the termination have been settled by agreement except plaintiff's claim for "unliquidated overhead charges." Only these charges are involved in the present suit.

The contract contemplated that 60,000 hours of labor would be required to do the work, and it was agreed that plaintiff would be paid $1.97 an hour for "overhead and proprietary charges," in addition to the agreed hourly rate for each class of labor required to do the work. Plaintiff had spent only 33,885.25 hours on the work before the contract was terminated. It has been paid for these hours of labor plus the charge of $1.97 an hour for "overhead and proprietary" charges for the 33,885.25 hours worked. Plaintiff claims that it is entitled to recover the $1.97 on the entire 60,000 hours.

We are of opinion that the provision of the contract on which plaintiff relies in support of its claim has no application to a termination of the contract for the convenience of the Government, and that it is not entitled to recover on any other ground.

The terms of the contract were agreed upon after negotiation, which began on December 2, 1944, when defendant's Army Service Forces, New York Ordnance District, War Department, requested plaintiff to submit a proposal for the reconditioning of 1,200 Army jeeps. It was stated that payment for the work required would be made on the basis of an agreed hourly rate for the several classes of direct labor involved, and a proposal was requested based on such hourly rates, fixed at a level high enough to include all elements of plaintiff's costs, including wages, overhead, and profit. In other words, payment of the hourly rate for the number of hours worked was intended to cover all items of cost and profit.

Plaintiff was informed that the average time experienced on other contracts for repair of jeeps was 50 hours per vehicle, which for 1,200 jeeps would amount to 60,000 hours, and that 1,200 jeeps could be delivered to plaintiff's plant in three months at the rate of 400 per month.

In preparing its proposal plaintiff estimated that its "overhead and proprietary" charges would amount to $135,000, and it proposed to use this figure in computing the hourly rate to be charged. On the basis of the contemplated 60,000 hours of direct labor, this would have amounted to $2.26 for each hour of direct labor. Defendant thought this rate was too high, and requested plaintiff to reduce it to below $2.00 per hour.

By a letter dated December 11, 1944, plaintiff submitted its proposal containing a proposed hourly charge for each class of labor, which included itemized rates for straight time labor, excess for overtime, and for overhead and profit. The hourly overhead rate was $1.97 an hour on each class of labor. In the letter plaintiff stated that is was its understanding that if the Government failed to provide vehicles, parts, or supplies in sufficient quantities to keep plaintiff's employees fully occupied, the Government would make an equitable adjustment in the contract to cover the resulting losses, and that in making such adjustment it would be understood that plaintiff's prices were based "on the productive use of 20,000 man-hours per month."

By letter dated December 16, 1944, defendant's contracting officer accepted plaintiff's offer and directed it to proceed immediately with the work, but with the understanding that within a reasonable time the agreement between the parties would be embodied in a single instrument following the form of War Department Supply Contract Form No. 1, as amended, which would contain all the usual requirements, together with the articles contemplated in plaintiff's offer.

Shortly thereafter, in December 1944, defendant forwarded to plaintiff contract forms for execution, but these were recalled when it was discovered that a mistake had been made in the numbering of the document, and on January 13, 1945, defendant transmitted a corrected contract to plaintiff.

By letter dated January 18, 1945, plaintiff suggested certain amendments to the contract including the following one:

"In the event that the Government fails to provide cars or materials resulting in work stoppage, the contractor's employees remaining on the job shall be paid for at the rates provided in Schedule A. In the event that the contracting officer directs the release of employees during such work stoppage, the contractor shall be reimbursed in accordance with the following provisions. If during January the actual hours work shall be less than 5,000, the contractor shall be reimbursed for the difference between the actual hours work and 5,000, at the overhead rate of $1.97. For the successive months of February, March and April, the contractor shall be reimbursed on the basis of the difference between the actual hours work and 15,000 hours for February and 20,000 hours each for March and April."

At a conference held on January 20, 1945, between representatives of the plaintiff and defendant, plaintiff's proposed amendment was changed to read as follows, and was incorporated in the contract as article 1 B 1(d):

"(d) It is understood that if the Government fails to deliver to the Contractor all or a part of the material required to be furnished by the Government in sufficient time to allow the Contractor to maintain a continuous flow of productive work at its plant, the Contractor may incur additional costs by reason of increased overhead and other expenses resulting from said failure. Accordingly it is agreed that if there is any delay in delivering the material called for by this aritcle to the Contractor which results in a stoppage of productive work under this contract in the Contractor's plant, then the Contracting Officer shall in writing either authorize the maintenance of work crews during such stoppage, or in the alternative the release of such crews; and in the case of the occurrence of either alternative, the amount to be paid the

Contractor under this contract shall be adjusted equitably by negotiation to compensate the Contractor for any increased costs resulting from such delay. In this connection it is understood and agreed that the labor hourly rates hereinafter set forth and provided in this contract have been negotiated and agreed on the basis of the Contractor furnishing an estimated 5,000 man-hours for the month of January, 15,000 man-hours for the month of February, and 20,000 man-hours for the months of March and April of the labor of the categories listed in Schedule "A" attached hereto and made a part hereof."

It is this provision upon which plaintiff relies.

No statements were made at the conference to the effect that the defendant guaranteed payment in any event of 60,000 hours of overhead at a rate of $1.97 per hour. There was no discussion about payment of overhead in the event of termination of the contract at the convenience of the defendant, although the right to terminate was expressly reserved in article 12 of the contract. The entire discussion concerned only the possibility of stoppage of work caused by defendant's failure to provide sufficient jeeps and materials.

Plaintiff did request an explanation of how an equitable adjustment would be made. Accordingly, a letter was prepared and forwarded to plaintiff by defendant's chief, contract section of the legal branch, which explained how an equitable adjustment would be made, if necessary under the provisions of article 1 B 1(d) of the proposed contract.

Plaintiff then on January 25, 1945 transmitted executed copies of the contract to defendant.

The contract required plaintiff to provide the plant facilities, equipment, and labor necessary to perform the work required on the 1,200 jeeps. Defendant was required to furnish replacement parts, lubricants, and other materials. Plaintiff promised to make delivery of 100 jeeps in January, 300 in February, 400 in March, and 400 in April, 1945.

The contract provided for payment to plaintiff on the basis of direct labor hours expended on the work at rates provided in Schedule A of the contract. The schedule set forth the agreed hourly rate for each class of labor involved, which charge was itemized as to each of the four factors of straight-time labor, excess for overtime, overhead, and profit. Overhead was listed at $1.97 for each hour spent by all classes of labor.

By supplemental agreement executed March 5, 1945, the parties agreed to increase the number of jeeps to be repaired and reconditioned to the total number of 1,600, and provided for the delivery of the additional 400 during May 1945.

By telegram of March 10, 1945, confirmed by letter of March 12, 1945, plaintiff was advised by defendant's New York Ordnance District that the contract was terminated for the convenience of the Government, effective March 13, 1945, as to 1,555 of the jeeps. The telegram stated that the contract was not terminated as to 45 of the jeeps.

Defendant's contracting officer made written findings of fact dated February 7, 1947, and transmitted them to plaintiff. It was stated that such findings were made pursuant to section 13 of the Contract Settlement Act of 1944. One of the findings was that nothing was due plaintiff on its claim for overhead charges because the contract between the parties did not unconditionally guarantee payment to the contractor of 60,000 hours of overhead at $1.97 per hour.

Plaintiff appealed from the denial of its claim by the contracting officer on May 8, 1947, and, after a hearing before the Appeal Board, Office of Contract Settlement, this Board by written opinion affirmed the contracting officer in denying plaintiff's claim.

Article 1 B 1(d) is unambiguous. It provides for an equitable adjustment

only in the event of a stoppage of work due to a delay on the part of the Government in delivering the required materials. Overhead charges were to be paid only as labor was performed. No provision was made for paying any sum on this account in the event of termination for the convenience of the Government. When the contract was terminated, work was supposed to cease and overhead was supposed to cease at the same time.

We find in article 1 B 1(d) no unconditional guarantee to pay plaintiff for 60,000 hours of overhead. The article deals only with work stoppage due to defendant's delay in delivering materials. It does not deal with the termination of the contract for the convenience of the Government. In the negotiations leading to the inclusion of article 1 B 1(d) in the contract there was no discussion concerning the payment of overhead in the event of a termination of the contract.

Plaintiff alleges that in terminating the contract the defendant was in reality seeking to avoid the consequences of article 1 B 1(d), and that if the Government had not terminated the contract, a delay in work would have occurred due to defendant's failure to furnish materials. There is no evidence whatever to substantiate this contention.

The Appeal Board, Office of Contract Settlement, in considering plaintiff's claim, stated that under the termination article of the contract and the "Statement of Cost Principles" which was incorporated therein by reference, plaintiff was entitled to recover initial costs allocable to the terminated part of the contract, and that such initial costs were defined as costs of a nonrecurring nature which arise from unfamiliarity with the product in the initial stages of production. It dismissed plaintiff's claim because there was no evidence to indicate that the costs to be covered by the overhead item were nonrecurring in nature. Plaintiff has offered no evidence to this court to establish that the $1.97 per hour overhead was to recover costs of a nonrecurring nature. So far as the proof shows, it covered constantly recurring overhead, incurred as the work was done.

For the foregoing reasons we conclude that plaintiff has failed to establish a claim under its contract, and its petition is dismissed.

It is so ordered.

LARAMORE and LITTLETON, Judges, concur.

MADDEN, Judge, concurs in the result.

JONES, Chief Judge (concurring).

I concur in the result. The only basis of a recoverable claim on the part of plaintiff would be on the ground that it was not reimbursed for its initial expenses. Such expenses are recoverable in termination proceedings. However, the Appeal Board, Office of Contract Settlement, after a hearing, decided this issue against plaintiff. Plaintiff had 90 days after the decision of the board within which to bring suit in this court to review the decision of the board. According to the Contract Settlement Act of 1944, 58 Stat. 649, 41 U.S.C.A. § 101 et seq., if it does not sue in this period, the decision of the board becomes final and conclusive. Plaintiff did not sue within the prescribed period and its action is therefore barred.